**FILED**

**TD**

12/31/2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint                    Trial Attorney Andres Q. Almendarez (202) 258-7149

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

AMIRALI BHIMANI

CASE NUMBER: 24-cr-620

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about March 13, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, AMIRALI BHIMANI, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1347 | did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, by submitting and causing to be submitted, a claim for the provision of eight OTC kits to beneficiary L.R., when such services were not provided. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

_____
Randell Harold
Special Agent, FBI

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: December 31, 2024      _____
*Judge's signature*

City and state: Chicago, Illinois    Young B. Kim, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Randell M. Harold, being duly sworn, state as follows:

1. I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI"). I have been so employed since June 2022.

2. My duties and responsibilities as an FBI Special Agent include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code 1343 (wire fraud) and Title 18, United States Code 1347 (health care fraud). I also investigate allegations of fraud, waste, and abuse in connection with federal and state health care programs, including Medicare and Medicaid. I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants and arrests. I am a graduate of the FBI Special Agent Basic Training Program. In addition, I am a certified public accountant.

3. This affidavit is made in support of an application for (i) a complaint charging AMIRALI BHIMANI ("BHIMANI") with health care fraud, in violation of Title 18, United States Code, Section 1347 (the "**Subject Offense**"), (ii) a search warrant for the business premises of ADB Medical Supplies Inc., located at 4255 Westbrook Drive, Suite 223, Aurora, Illinois (the "**Subject Premises**"), and (iii) a

1

search warrant for the cellular telephone answering to (773) 501-0795 (the "**Subject Phone 1**").

4. The FBI and United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG") are investigating a nationwide scheme that has resulted in excess of $500 million in false and fraudulent claims submitted to Medicare. The scheme involves hundreds of laboratories and durable medical equipment ("DME") businesses located across at least 17 different states that have illegally used Medicare beneficiary data from Marketing Company 1. After acquiring Medicare beneficiary data from Marketing Company 1, the businesses utilize the data to fraudulently submit claims for over-the-counter COVID-19 test kits ("OTC kits"), respiratory panel tests, and for DME such as back, knee, or shoulder braces that were not requested, medically unnecessary, and/or sometimes not provided to Medicare beneficiaries.

5. As part of the investigation, and as described further below, law enforcement identified Illinois-based businesses connected to BHIMANI, including CHICAGO CARE LAB SERVICES LLC ("CHICAGO CARE"), V CARE TESTING CENTRE CORP. ("V CARE"), AL-AMEER TESTING CENTER INC. ("AL-AMEER"), and ADB MEDICAL SUPPLIES INC. ("ADB MEDICAL"). As described further below, there is probable cause to believe that CHICAGO CARE, V CARE, AL-AMEER, and ADB MEDICAL obtained Medicare beneficiary data from Marketing Company 1—an entity connected to BHIMANI—and submitted fraudulent claims to

2

Medicare through Billing Company 1—also an entity also connected to BHIMANI—as part of the scheme.

6. In summary, and as further explained in detail below, the investigation has shown that, between approximately September 8, 2022, and June 1, 2023:

a. While at times using Billing Company 1, CHICAGO CARE, V CARE, and AL-AMEER collectively submitted more than $227 million in claims seeking reimbursement from Medicare for OTC kits, and were paid in excess of $170 million for those claim submissions;

b. CHICAGO CARE, V CARE, and AL-AMEER collectively paid Marketing Company 1 more than $11 million to obtain Medicare beneficiary data;

c. BHIMANI, through his association with Marketing Company 1, facilitated the transfer of Medicare beneficiary data from Marketing Company 1 to CHICAGO CARE, V CARE, and AL-AMEER;

d. BHIMANI knew that the Medicare beneficiary data he transferred to CHICAGO CARE, V CARE, and AL-AMEER, which at times included data for deceased Medicare beneficiaries, was being used to fraudulently bill Medicare for OTC kits that were not requested, and/or sometimes not provided to Medicare beneficiaries;

e. BHIMANI attempted to conceal the fraudulent nature of the Medicare beneficiary data in various ways, including by using or causing others to

3

use, artificial intelligence to generate fake phone call recordings of Medicare beneficiaries purportedly requesting OTC kits;

f.    BHIMANI, through his association with Billing Company 1, interacted with the CHICAGO CARE, V CARE, and AL-AMEER accounts at Billing Company 1 from an IP address that, since at least July 16, 2023, was subscribed to at the **Subject Premises**, and such interactions at times occurred on dates when Billing Company 1 submitted claims to Medicare seeking reimbursement for OTC kits on behalf of CHICAGO CARE, V CARE, and AL-AMEER;

g.    ADB MEDICAL is a DME company owned and controlled by BHIMANI and located at the **Subject Premises**;

h.    ADB MEDICAL obtained Medicare beneficiary data from Marketing Company 1 and utilized Billing Company 1 to submit claims for DME that were not requested, medically unnecessary, and in some cases not provided; and

i.    BHIMANI utilized **Subject Phone 1** to perform communications in furtherance of the fraudulent scheme with Individual M.S., Individual D.A., and others.

7.    Furthermore, there is probable cause to believe that evidence, instrumentalities, and fruits of the **Subject Offense** will be located in the **Subject Premises**, which is a location from which BHIMANI committed the **Subject Offense**, and that evidence and instrumentalities will be located in the **Subject Phone 1**, which was used by BHIMANI in furtherance of the **Subject Offense**.

8.      I have not included every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause to believe that BHIMANI committed the **Subject Offense**, and that evidence related to the **Subject Offense** will be found in the **Subject Premises** and **Subject Phone 1**.

## I.      BACKGROUND INFORMATION

### A.      Background Information on Medicare

9.      The Medicare Program ("Medicare") is a federally funded program that provides free and below-cost health care benefits to people age 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS"), an agency of HHS, is responsible for the administration of Medicare. Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

10.      Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covers outpatient physician services, such as office visits, minor surgical procedures, DME, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

11.      "Part C" of Medicare, commonly referred to as "Medicare Advantage," provides enrolled beneficiaries with services typically covered under Parts A and B, in addition to optional supplemental benefits, and is administered by private insurance companies.

5

12.     Medicare "providers" include clinical laboratories, physicians, DME companies, and other health care providers who provide items and services to beneficiaries. In order to have the capability to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements to which the provider must agree before enrolling with Medicare. Specifically, the certification statement sets forth, in part, that the provider agrees to abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

13.     A beneficiary eligible for Medicare may choose to be covered under "original" Medicare, where qualifying items and services are covered under Parts A and B, or under Part C (Medicare Advantage). A beneficiary who selects coverage under Medicare Advantage enrolls in a Medicare Advantage plan managed by a private insurance company ("Medicare Advantage Plan"). *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28. A Medicare Advantage Plan is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

14.     Under Part C, CMS pays a Medicare Advantage Plan a monthly fixed, capitated (per beneficiary) amount, adjusted by the expected risk of each beneficiary.

15.     Medicare Advantage Plans are required to provide at least the same benefits as traditional Medicare. Medicare Advantage Plans must "provide coverage of, by furnishing, arranging for, or making payment for, all services that are covered

by Medicare Part A and Part B," which includes coverage for DME. *See* 42 U.S.C. § 1395w-22(a)(1); 42 C.F.R. § 422.101.

16. Medicare Advantage Plans receive, adjudicate, and pay claims from providers seeking reimbursement for the cost of health care benefits, items, or services provided to Medicare beneficiaries. Each Medicare Advantage Plan operates an internal investigation unit responsible for conducting investigations of potential fraud, waste, and abuse. *See* 42 C.F.R. § 422.503(b)(4)(vi).

17. Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. In the past, BINs were composed of either a beneficiary's Social Security Number or randomly selected numbers and letters. Since 2015, Congress mandated CMS phase out the use of Social Security Numbers, and CMS now assigns Medicare beneficiaries a randomly generated number called a Medicare Beneficiary Identifier ("MBI"). One purpose of this change was to improve patient identity protection and prevent identity theft. These MBIs and BINs are considered "means of identification" pursuant to 18 U.S.C. § 1028(d)(7).

18. The Investigations Medicare Integrity Contractor (the "I-MEDIC") is a CMS contractor that conducts investigations into fraud, waste, and abuse in the Medicare Parts C and D programs. The I-MEDIC receives and investigates

7

complaints from many sources including Medicare beneficiaries and Medicare Advantage Plans. When appropriate, the I-MEDIC refers cases to law enforcement.

19. Medicare Advantage Plans must comply with CMS's general coverage guidelines included in Medicare manuals and instructions unless superseded by CMS's Part C regulations or related instructions. *See* 42 C.F.R. § 422.101(b)(2). No Medicare payment may be made under Part A or Part B for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A). Accordingly, Medicare Advantage Plans may not pay for DME that is not medically necessary. *See also* 42 C.F.R. § 422.1122(a)(6) and Medicare Managed Care Manual, Chapter 4, Sections 10.2 and 10.16.

20. In cases where Medicare rules require that services be ordered or referred by a physician or other qualified practitioner, the provider authorizing the service is known as the "referring provider."

21. A National Provider Identifier ("NPI") is a unique ten-digit identification number issued to health care providers by CMS. All health care providers that transmit health information in electronic form, including claims for payment, must obtain an NPI. CMS developed the National Plan and Provider Enumeration System ("NPPES")[1] to assign NPIs. Health care providers may apply

---

[1] The NPPES website is an HHS-maintained database which maintains publicly available information regarding healthcare providers.

for an NPI by completing an online application. The online application process consists of registering for an Identity & Access User ID and completing the NPI application, which includes identifying the organization, its Employer Identification Number, providing the business mailing and practice addresses, and designating a contact person, including identifying that individual's title, email address, and telephone number.[2]

22.   Based on my knowledge of the investigation, my training and experience, and the training and experience of other law enforcement officers, I know that by agreeing to the terms of the Medicare Electronic Data Interchange Enrollment ("EDI") form, a medical provider affirms that, with respect to any claim submitted by the provider, it will "retain all original source documentation and medical records pertaining to any such particular Medicare claim for a period of at least 6 years, 3 months after the bill is paid." The EDI form further states that every source document must reflect the beneficiary's name, beneficiary's Medicare beneficiary identifier, date(s) of service, diagnosis/nature of illness, and procedure/services performed. According to records provided by a Medicare contractor, BHIMANI's digital signature appears on the most recent execution of this form on behalf of ADB MEDICAL on or about January 27, 2023.

---

[2] *See* National Provider Identifier Standard (NPI), https://www.cms.gov/medicare/regulations-guidance/administrative-simplification/how-apply (last accessed April 24, 2024).

**B.      Background on COVID Over the Counter Test Kits**

23.      In April 2022, the federal government announced that individuals with Medicare could receive up to eight OTC kits per calendar month from participating pharmacies and health care providers for the duration of the COVID-19 public health emergency ("PHE") at no cost to beneficiaries. The PHE ended on May 11, 2023, at which point Medicare would no longer pay for eight OTC kits per month at no cost to beneficiaries. However, on February 9, 2023, Medicare announced that it is allowing a one-year grace period for providers to bill OTC kits that were provided to beneficiaries prior to May 11, 2023, but that the provider was unable to bill prior to the May 11, 2023 deadline.

24.      To receive reimbursement from Medicare for the OTC kits, providers must submit a claim form with certain information regarding the Medicare beneficiary. As relevant here, the claim form must identify the type of services provided (using a Healthcare Common Procedure Coding System, or "HCPCS" code), and the HCPCS code for OTC kits is "K1034". CMS's guidance to providers billing for these OTC kits is to "only give patients the tests when they request them." Additionally, CMS instructed providers to "keep good documentation. We may ask to see documentation showing a patients' request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions."

C.    **Background on Claim Submissions to Medicare and Office Ally**

25.    Medicare accepts claim submissions in a variety of ways, including through third-party billing clearinghouses. A billing clearinghouse is an organization that acts as an intermediary between healthcare providers or billing companies and insurance companies, including Medicare.

26.    Office Ally is a third-party billing clearinghouse approved by Medicare to submit health care claims electronically to Medicare for reimbursement. Office Ally maintains accounts created by its customers and retains customer information, including contracts, claim submission data, authorized users, and IP address logs. Office Ally permits account holders to establish sub-accounts under a main account. A main account is typically maintained by a medical billing company. The main account holder may set up separate sub-accounts for each client or customer for which the billing company submits claims on behalf of.

D.    **Background on ADB Medical and the Subject Premises**

27.    According to records obtained from the Illinois Secretary of State, on or about April 7, 2022, Articles of Incorporation were filed with the Illinois Secretary of State, forming ADB MEDICAL. Within this filing, BHIMANI was listed as the registered agent and incorporator, with the registered office of 3727 Highknob Cir., Naperville, Illinois. According to records obtained from the Illinois Secretary of State, as of on or about December 27, 2024, the most recent publicly available filing on behalf of ADB MEDICAL was an annual report filed on or about April 25, 2024, listing BHIMANI as the registered agent, president, secretary, and director.

11

28.     According to information obtained from NPPES, as of on or about September 30, 2024, the **Subject Premises** was the primary practice address for ADB MEDICAL.

29.     ADB MEDICAL has been enrolled as a durable medical equipment ("DME") and medical supplies provider with Medicare since on or about August 13, 2022. On or about February 8, 2024, Medicare revoked ADB MEDICAL's enrollment with the final adverse legal action of "STANDARD OR CONDITION VIOLATION."[3] The primary practice location listed with Medicare enrollment records was the **Subject Premises**.

30.     According to records received from the Illinois Department of Employment Security, ADB MEDICAL had just two employees between in or around July 2023 and in or around March 2024: BHIMANI and Individual D.A.

---

[3] According to records provided by the Unified Program Integrity Contractor, Midwestern Jurisdiction, CoventBridge (USA) Inc., on or about December 19, 2023, CoventBridge (USA) Inc., referred ADB MEDICAL to the DME National Provider Enrollment East contractor, Novitas Solutions, for complaints regarding a possible violation of supplier standards. CoventBridge (USA) Inc. interviewed Medicare beneficiaries for whom ADB MEDICAL submitted claims. In its referral, CoventBridge (USA) Inc. noted, among other allegations, that "investigators interviewed Medicare beneficiaries who stated that they did not receive any of the items from ADB [MEDICAL] billed to Medicare" and "these findings indicate ADB [MEDICAL] may have inappropriately billed Medicare in an attempt to receive payment."

12

## II.    FACTS SUPPORTING PROBABLE CAUSE

### A.    Chicago Care Lab Services LLC, V Care Testing Centre Corp., and Al-Ameer Testing Center Inc. Submitted Fraudulent Claims to Medicare.

31.    The investigation began in May 2023, when law enforcement agencies detected a massive spike in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased, followed by complaints from Medicare beneficiaries on whose behalf OTC kits were billed to Medicare but who did not receive OTC kits. As explained in greater detail below, CHICAGO CARE, V CARE, and AL-AMEER operated as purported laboratories located in the Chicago metropolitan area that participated in this scheme by fraudulently billing Medicare throughout 2023 for OTC kits that were not provided as represented.

### 1.    Chicago Care Lab Services LLC

32.    According to data provided by Medicare, between on or about February 13, 2023, and on or about June 1, 2023, CHICAGO CARE submitted approximately 634,963 claims to Medicare seeking approximately $76,195,270 in reimbursement for OTC kits purportedly provided to Medicare beneficiaries. As of on or about June 7, 2023, Medicare records indicate that CHICAGO CARE has been paid approximately $56,336,366 for those claims.

33.    Law enforcement initiated an investigation into CHICAGO CARE in May 2023, when law enforcement agencies detected an increase in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries

13

who were deceased. Further, as of on or about November 5, 2024, approximately 42,926 Medicare beneficiaries filed complaints against CHICAGO CARE alleging their Medicare numbers were used to bill Medicare for OTC kits purportedly provided to them, even though they did not request, and in some cases, did not receive, the OTC kits. The investigation determined that CHICAGO CARE submitted fraudulent claims to Medicare and that Medicare paid millions of dollars in reimbursement to CHICAGO CARE for those claims.

34. On or about June 23, 2023, U.S. Magistrate Judge Jeffrey Cole authorized a seizure warrant in case number 23 M 636 for thirteen accounts held at various banks and associated with the CHICAGO CARE funds. As set forth in the application for the seizure warrant, probable cause for the seizure was based on, among other evidence: (a) the thousands of complaints filed by Medicare beneficiaries alleging they did not request or, in some cases, receive the OTC kits that were billed to Medicare; (b) law enforcement interviews with five Medicare beneficiaries (and/or the beneficiaries' spouses) who further confirmed to law enforcement that the OTC kits billed to Medicare using the beneficiaries' Medicare identification numbers were not requested, and in at least one instance, not received; (c) analysis of Medicare claims data which demonstrated an increase in Medicare billing that was inconsistent with CHICAGO CARE's prior Medicare billing history; and (d) billing by CHICAGO CARE for OTC kits that were purportedly requested by and delivered to at least approximately 31 deceased beneficiaries.

35. According to an electronic funds transfer ("EFT") agreement included with Medicare Provider Enrollment, Chain, and Ownership System ("PECOS") records, Medicare monies for claim reimbursement by CHICAGO CARE were to be electronically deposited into CHICAGO CARE checking account at JPMorgan Chase xxxxx9668 (the "CHICAGO CARE Medicare Account") starting approximately on or about July 18, 2022. Consistent with the general scheme set forth above, records received from JPMorgan Chase for the CHICAGO CARE Medicare Account indicate that between on or about March 30, 2023, and on or about May 24, 2023, CHICAGO CARE wired approximately $3,417,353.52 to Marketing Company 1.

### 2. V Care Testing Centre Corp.

36. According to data provided by Medicare, between on or about April 7, 2023, and on or about May 31, 2023, V CARE submitted approximately 623,719 claims to Medicare seeking approximately $74,846,280.00 in reimbursement for OTC kits purportedly provided to Medicare beneficiaries. As of on or about June 7, 2023, Medicare records indicate that V CARE has been paid approximately $55,664,689.92 for those claims.

37. Law enforcement initiated an investigation into V CARE in May 2023, when law enforcement agencies detected an increase in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased. Further, as of on or about November 14, 2024, approximately 36,966 Medicare beneficiaries filed complaints with Medicare against V CARE, alleging their Medicare numbers were used to bill Medicare for OTC kits purportedly provided to

15

them, even though they did not request, and in some cases, did not receive, the OTC kits. The investigation determined that V CARE submitted fraudulent claims to Medicare and that Medicare paid millions of dollars in reimbursement to V CARE for those claims.

38. On or about June 23, 2023, U.S. Magistrate Judge Jeffrey Cole authorized a seizure warrant in case number 23 M 631 for three accounts held at various banks and associated with the fraudulent V CARE funds. As set forth in the application for the seizure warrant, probable cause for the seizure was based on, among other evidence: (a) more than one thousand complaints filed by Medicare beneficiaries alleging they did not request or, in some cases, receive the OTC kits that were billed to Medicare; (b) law enforcement interviews with six Medicare beneficiaries (and/or relatives of the Medicare beneficiaries) who further confirmed to law enforcement that the OTC kits billed to Medicare using the beneficiaries' Medicare identification numbers were not requested, and in at least one instance, not received; (c) analysis of Medicare claims data which demonstrated an increase in Medicare billing that was inconsistent with V CARE's prior Medicare billing history; and (d) billing by V CARE for OTC kits that were purportedly requested by and delivered to at least approximately 86 deceased beneficiaries.

39. According to an EFT agreement included with Medicare PECOS records, Medicare monies for claim reimbursement by V CARE were to be electronically deposited into V CARE checking account xxxxx0975 at BMO Harris (the "V CARE

16

Medicare Account") starting approximately on or about August 6, 2022. Financial institution records show that V CARE also maintained a second account at BMO Harris: xxxxx4595. Consistent with the general scheme set forth above, records received from BMO for the V CARE Medicare Account and V CARE account xxxxx4595 indicate that between on or about May 1, 2023, and on or about May 23, 2023, V CARE wired approximately $3,909,082.00 to Marketing Company 1.

### 3. Al-Ameer Testing Center Inc.

40. According to data provided by Medicare, between on or about April 3, 2023, and on or about June 1, 2023, AL-AMEER submitted approximately 635,721 claims to Medicare seeking approximately $76,286,520.00 in reimbursement for OTC kits purportedly provided to Medicare beneficiaries. As of on or about June 7, 2023, Medicare records indicate that AL-AMEER has been paid approximately $58,277,467.92 for those claims.

41. Law enforcement initiated an investigation into AL-AMEER in May 2023, when law enforcement agencies detected an increase in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased. Further, as of on or about November 5, 2024, approximately 33,769 Medicare beneficiaries filed complaints with Medicare against AL-AMEER, alleging their Medicare numbers were used to bill Medicare for OTC kits purportedly provided to them, even though they did not request, and in some cases, did not receive, the OTC kits. The investigation determined that AL-AMEER submitted fraudulent

17

claims to Medicare and that Medicare paid millions of dollars in reimbursement to AL-AMEER for those claims.

42. On or about June 23, 2023, U.S. Magistrate Judge Jeffrey Cole authorized a seizure warrant in case number 23 M 638 for seven accounts held at various banks and associated with the fraudulent AL-AMEER funds. As set forth in the application for the seizure warrant, probable cause for the seizure was based on, among other evidence: (a) more than one thousand complaints filed by Medicare beneficiaries alleging they did not request or, in some cases, receive the OTC kits that were billed to Medicare; (b) law enforcement interviews with seven Medicare beneficiaries who further confirmed to law enforcement that the OTC kits billed to Medicare using the beneficiaries' Medicare identification numbers were not requested, and in at least seven instances, were not received; (c) analysis of Medicare claims data which demonstrated an increase in Medicare billing that was inconsistent with AL-AMEER's prior Medicare billing history; and (d) billing by AL-AMEER for OTC kits that were purportedly delivered to at least approximately 61 deceased beneficiaries.

43. According to an EFT agreement included with Medicare PECOS records, Medicare monies for claim reimbursement by AL-AMEER were to be electronically deposited into an AL-AMEER checking account xxxxx9668 at Bank of America (the "AL-AMEER Medicare Account") starting approximately on or about August 21, 2022. AL-AMEER also maintained a second account at Bank of America: xxxxx4599.

Consistent with the general scheme set forth above, records received from Bank of America for the AL-AMEER Medicare Account and AL-AMEER account xxxxx4599 indicate that between on or about April 24, 2023, and on or about May 18, 2023, AL-AMEER wired approximately $4,279,483.00 to Marketing Company 1.

44.     According to financial records received from Brex, Inc., the online bank utilized by Marketing Company 1, DME Company 1, Edutech Solutions LLC[4] ("Edutech"), Individual M.S., and Marketing Company 2[5], all sent and/or received funds from Marketing Company 1 between on or about June 13, 2022, and on or about May 16, 2023.

**B.     BHIMANI Knowingly Participated in the Fraudulent Billing Scheme While Using the Subject Premises and Subject Phone 1.**

**1.     BHIMANI, Individual D.A., and Individual M.S. are Associated with Marketing Company 1**

45.     According to bank records for Marketing Company 1, between on or about October 5, 2022, and on or about February 28, 2023, BHIMANI's company, Edutech, made payments to Marketing Company 1 totaling approximately $9,531. According to bank records of Marketing Company 1, between on or about June 13,

---

[4] According to the most recent publicly available filing with the Illinois Secretary of State, which was made on or about November 1, 2023, Edutech's registered agent and sole manager is BHIMANI. Additionally, this filing identified Edutech's principal place of business as 3727 Highknob Cir, Naperville, Illinois, which is the listed residence of BHIMANI on his Illinois driver's license.

[5] According to the most recently publicly available filing with the Illinois Secretary of State which was made on or about March 20, 2023, Marketing Company 2's registered agent and sole manager is Individual M.S.

19

2022, and on or about February 2, 2023, DME Company 1[6] made payments to Marketing Company 1 totaling approximately $86,352.

46.     On or about December 4, 2024, law enforcement interviewed BHIMANI and Individual D.A. inside the **Subject Premises**. While inside the **Subject Premises**, law enforcement observed a desktop computer, several cellular telephones, and a storage shelf which appeared to hold DME.

47.     During the interview, in BHIMANI's presence, Individual D.A. stated that DME Company 1 previously used Marketing Company 1 for marketing, but more recently began using Billing Company 1 to market itself to patients. Individual D.A. identified Individual R.C., a Pakistan resident who Individual D.A. had known socially for many years, as the person responsible for connecting DME Company 1 with Marketing Company 1.

48.     In addition, based on messages obtained from a cellular telephone used by Individual M.S., whose entity, Marketing Company 2, received over $1 million in payments from Marketing Company 1, between on or about March 24, 2023, and on or about May 16, 2023, BHIMANI appears to have had direct online access to Marketing Company 1's bank account and was capable of causing payments from Marketing Company 1's bank account.

---

[6] DME Company 1 was owned by Individual D.A. according to Medicare enrollment records and Individual D.A.'s statements during an interview with law enforcement on or about December 4, 2024.

20

49.     On or about December 2, 2024, U.S. Magistrate Judge Sheila M. Finnegan authorized a search and seizure warrant in case number 24 M 938 for a cellular telephone subscribed to Individual M.S.  Then, on or about December 4, 2024, law enforcement executed this search warrant. Law enforcement recovered communication from Individual M.S.'s cellular phone that was believed to be sent by BHIMANI utilizing **Subject Phone 1**[7] and a second cellular telephone number answering to 331-980-5531 (the "Subject Phone 2").[8]

50.     During the search of Individual M.S.'s cellular phone, law enforcement located the messages exchanged between BHIMANI, using Subject Phone 2, and Individual M.S., in which BHIMANI demonstrated to Individual M.S. that he had access to Marketing Company 1's bank account and/or knowledge about Marketing Company 1's finances.

---

[7] Law enforcement identified BHIMANI as the user of **Subject Phone 1** based on the following information: 1) subscriber records received from AT&T for the **Subject Phone 1** which identified a "Rozina Bhimani," believed to be BHIMANI's wife, as the wireless subscriber; and 2) BHIMANI's statements during the December 4, 2024, interview with law enforcement, during which he stated his phone number was **Subject Phone 1**.

[8] Law enforcement identified BHIMANI as the user of Subject Phone 2 based on information including, but not limited to, the following: 1) law enforcement's observations during a review of Individual M.S.'s phone that Subject Phone 2 was saved under the name "Amir Ali 2" (BHIMANI's first name is Amirali); and 2) statements made by Individual M.I. during an interview with law enforcement on or about June 6, 2023, during which Individual M.I. identified Individual M.S. and BHIMANI as his/her points of contact for Marketing Company 1 and further provided the phone number for both **Subject Phone 1** and Subject Phone 2 as BHIMANI's.

21

51. For example, on or about March 15, 2023, Individual M.S. sent a photograph of a 'Wire Transfer Outgoing Request' form from JPMorgan Chase detailing a wire transfer request from Sales Company 1 to Marketing Company 1 in the amount of approximately $250,000. According to Brex, Inc. records, Marketing Company 1 received a wire from Sales Company 1 in the amount of $250,000 on or about March 15, 2023. Immediately following the photograph sent by Individual M.S., BHIMANI, using Subject Phone 2, sent messages to Individual M.S., stating: "Payment received confirmed. . . . Text me your wire info. . . . First big payment Mubarak." In response, Individual M.S. sent BHIMANI wiring instructions for a bank account number ending in 9114 in the name of Individual M.S. at Bank of America. Based on Brex, Inc. records for Marketing Company 1, on or about March 17, 2023, Marketing Company 1 attempted to send an ACH transfer of $8,321 to Individual M.S.'s account ending in 9114, however, the ACH transfer was reversed. Subsequently, on or about March 21, 2023, Individual M.S. account ending in 9114 received a wire transfer in the amount of $8,321 from Marketing Company 1.

52. Subsequently, on or about April 14, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a message stating, "Your money is in [Marketing Company 1] and it's ready when ever you want."[9]

---

[9] At various points in the Affidavit, I have indicated (sometimes in brackets) my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from witnesses and other sources, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

22

53.     Additionally, messages identified by law enforcement during the search of Individual M.S.'s cellular telephone indicate that BHIMANI had access to an e-mail account bearing the name of Marketing Company 1 and that BHIMANI had access to correspondence Marketing Company 1 received from the Internal Revenue Service.

54.     On or about March 11, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a message containing a photograph of a computer screen in which the user of the computer has browser tabs open for an e-mail account in the name of "adbmedicalsup,"[10] a partially visible e-mail account in the name of "[Marketing Company 1]llc2020@," a Google sheets file titled "Chicago Lab," and an Office Ally webpage including claim details for CHICAGO CARE.

55.     On or about May 2, 2023, BHIMANI, using Subject Phone 2, received a message from Individual M.S. in which Individual M.S. wrote: "Please send ein for [Marketing Company 1]. In response, BHIMANI, using Subject Phone 2, typed out the ten-digit employer identification number ("EIN") for Marketing Company 1 and then sent a subsequent message containing a photograph of an Internal Revenue Service letter assigning Marketing Company 1 with the EIN that BHIMANI had already provided to Individual M.S.

---

[10] The full email account name was not visible in the image sent from Subject Phone 2, however, in PECOS enrollment paperwork, ADB MEDICAL provided e-mail address adbmedicalsupplies@gmail.com as the email address for correspondence, medical records, and revalidations from Medicare. According to subscriber records received from Google, email address adbmedicalsupplies@gmail.com is subscribed to BHIMANI and the account recovery telephone number listed on the account is **Subject Phone 1**.

> **2.** **BHIMANI and Individual M.S. Facilitated the Transfer of Medicare Beneficiary Information from Marketing Company 1 to Chicago-Area OTC Test Kit Providers, Including CHICAGO CARE, V CARE, and AL-AMEER**

56. During the analysis of Individual M.S.'s cellular telephone, multiple conversations were recovered by law enforcement that demonstrate BHIMANI and Individual M.S. were directly involved with transferring Medicare beneficiary data to CHICAGO CARE, V CARE, AL-AMEER, and other medical provider entities.

57. For example, on or about March 9, 2023, BHIMANI, using Subject Phone 2, exchanged a series of messages with Individual M.S. in which Individual M.S. discussed the potential terms of a new contract to be entered into with a laboratory pursuant to which the laboratory would make payments to Marketing Company 1 in exchange for "patient data." Individual M.S. wrote: "Call me . . . Need to discuss new lab that signed up today . . . Call me when ever you get a chance . . . Before I walk into the meeting . . . Marketing company responsible to boost online sales in form of but not limited to SEO [Search Engine Optimization] . . . Patient data is [confidential] and can not be re-used or shared . . . Patient will be replaced with other in the case of not being eligible . . . All payments to be made to [Marketing Company 1] in the form of wire. . . . Strict [bi-weekly] payment terms after the date of submission . . . Replacement of patient only after providing a complete EOB [Explanation of Benefits] . . . Shipping and distribution of kits are the sole responsibility of the LAB." BHIMANI responded, "Sounds good," and told Individual M.S. that "they [the laboratory] can draft [the contract]." Individual M.S. then

24

informed BHIMANI that "we [Marketing Company 1] are charging $35 [per patient lead]" and paying a $5 commission to the "finder" who introduced Individual M.S. to the laboratory.

58.     In subsequent communications, BHIMANI and Individual M.S. discussed the quantities of patient data (leads) that should be sent to various laboratories, including CHICAGO CARE. For example, on or about March 19, 2023, BHIMANI, using Subject Phone 2, received a message from Individual M.S., in which Individual M.S. wrote: "Monday 15k [Individual S.] . . . 5k care clinic . . . 10k Chicago care."

59.     Consistent with the terms of the draft contract Individual M.S. and BHIMANI discussed on or about March 9, 2023, Individual M.S. and BHIMANI repeatedly sought and received from laboratories "Explanation of Benefits" (or "EOB") forms showing the laboratories' billing for OTC kits purportedly sent to Medicare beneficiaries whose personal data had been supplied to the laboratories by Individual M.S. and BHIMANI. For example, on or about April 1, 2023, BHIMANI, using Subject Phone 2, received a message from Individual M.S., asking, "Did u by any chance get the EOB for Chicago care[?]" On or about, April 4, 2023, BHIMANI, using Subject Phone 2, sent a message to Individual M.S., stating, "All Chicago EOB's till April 04th 2023."

60.     On or about April 12, 2023, BHIMANI, using Subject Phone 2, received a message from Individual M.S. stating, "Figure out EOB for Al Ameer." In response,

25

BHIMANI wrote, "Ok." In response, Individual M.S. wrote, "What is this? Eob?" BHIMANI replied, "Al Ameer EOB. . . It should be in there [sic] account. . . Need biller invoice Also need to be paid in cash . . . Or they have to figure out to transfer in Pakistan account . . . for biller."

61.     On or about April 25, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a message stating, "898476692 . . . Check amount $1114189.44 . . . I am Requesting EOB but its unable to Download due to many pages. WIll send you once I have downloaded . . . Vcare."

62.     Consistent with the terms of the draft contract Individual M.S. and BHIMANI discussed on or about March 9, 2023, Individual M.S. and BHIMANI repeatedly discussed payments that laboratories needed to make, or had made, to Marketing Company 1 in exchange for the patient data Individual M.S. and BHIMANI had supplied to the laboratories. For example, on or about April 28, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a series of three photographs with spreadsheets labeled "Al Ameer," "Chicago," and "V Care." In each of the three photographs there are what appear to be ledger entries detailing an amount due and in two of three photographs an amount labeled "Remaining Payment" or "previous balance" which is circled with a handwritten note "[Marketing Company 1] due."

63.     Although the typical method of payment to Marketing Company 1 that Individual M.S. and BHIMANI discussed was wire transfers to the Marketing Company 1 bank account at Brex, Individual M.S. and BHIMANI also discussed cash

26

payments. For example, on or about March 31, 2023, BHIMANI, using Subject Phone 2, exchanged the following messages with Individual M.S.:

BHIMANI: Yah let's close his account

Individual M.S.: Ok I will take cash cut out before giving to [Individual D.A.] so I can deposit some cash in to [Marketing Company 1] also and not only wire

Individual M.S.: Cool ?

BHIMANI: No

BHIMANI: Don't touch cash yet until I return

64.     On or about April 17, 2023, BHIMANI, using Subject Phone 2, sent a photograph of a duffel bag full of cash to Individual M.S. Included below as *Image 1* is a portion of the photograph sent by BHIMANI through Subject Phone 2.



*Image 1*

27

> **3.** **BHIMANI had Knowledge that the Medicare Beneficiary Data Transferred from Marketing Company 1 to CHICAGO CARE, V CARE, AL-AMEER, and Others Contained Fraudulent Information and BHIMANI Took Steps to Conceal the Fraudulent Nature of Medicare Beneficiary Data Sent from Marketing Company 1**

65. During the review of Individual M.S.'s phone, multiple conversations were recovered by law enforcement demonstrating BHIMANI's knowledge that the Medicare beneficiary data he provided to CHICAGO CARE, V CARE, and AL-AMEER did not contain legitimate information related to Medicare beneficiaries requesting OTC kits. In furtherance of the scheme, BHIMANI took steps, or directed others to take steps, to create false records purporting to represent Medicare beneficiaries requesting OTC kits. Below are two separate message threads where, based on my training and experience, I believe BHIMANI and Individual M.S. discussed utilizing artificial intelligence to create false recordings which purported to represent Medicare beneficiaries requesting OTC kits. After the false recordings were created, BHIMANI and/or Individual M.S. distributed the false recordings to businesses in an attempt to conceal the fraudulent scheme.

66. On or about March 14, 2023, the following interaction occurred between Individual M.S. and BHIMANI, who was using **Subject Phone 1**[11]:

Individual M.S.: Do u have the 25 sample ?

BHIMANI: No

BHIMANI: You need it?

---

[11] The language was included verbatim, to include any typos and grammatical errors.

Individual M.S.: Shit [Laboratory 2] just messaged me

BHIMANI: With recording?

Individual M.S.: They wanted me to forward them contract. So I guess they are down

Individual M.S.: Yes

BHIMANI: Or no recording

Individual M.S.: With recording

BHIMANI: It will be ready tomorrow

BHIMANI: But you it's all AI

Individual M.S.: I know

Individual M.S.: Let's try

Individual M.S.: Might work

67.    On or about March 17, 2023, Individual M.S. sent a message to BHIMANI, who was using Subject Phone 2, containing a screenshot of a group message titled "Careclinical lab home test," included below as *Image 2*. Based on my training and experience, I believe that *Image 2* represents one of Marketing Company 1's customers, Care Clinical Lab, Inc. ("Care Clinical"), questioning the validity of the data Care Clinical purchased from Marketing Company 1 through BHIMANI and Individual M.S., as noted above in paragraph 58.

29



*Image 2*

68.     Immediately following the screenshot, Individual M.S. and BHIMANI, using Subject Phone 2, exchanged the following messages, included below as *Image 3*. Based on my training, experience, and understanding of this fraudulent scheme, I believe that *Image 3* represents a request from Individual M.S. to BHIMANI to create a false recording of a Medicare beneficiary requesting services.

30



*Image 3*

69.    On or about March 17, 2023, BHIMANI, using Subject Phone 2, then shared an audio file with Individual M.S. Law enforcement was able to listen to this

recording, and discovered it purporting to represent a recorded call that took place on February 10, 2023, of Medicare beneficiary L.R. requesting OTC kits. Law enforcement then reviewed Medicare claims data for Care Clinical, located in Skokie, Illinois. Included within Medicare claims details for Care Clinical was a claim submitted to Medicare on or about March 13, 2023, seeking reimbursement for eight OTC kits purportedly provided to Medicare beneficiary L.R. on or about March 10, 2023. Medicare claims data shows Medicare beneficiary L.R. was deceased as of on or about February 17, 2023. The claim submitted by Care Clinical for Medicare beneficiary L.R. requested reimbursement of approximately $120.00, however, the claim was denied for payment by Medicare with the stated denial reason "service date reported after date of death."

### 4. BHIMANI Regularly Used the Subject Premises and Subject Premises IP Address to Access the Medicare Billing Accounts for CHICAGO CARE, V CARE, and AL-AMEER

*The Subject Premises IP Address*

70. According to records received from Comcast, Comcast assigned IP address 69.243.185.89 (the "Subject Premises IP Address") to "ADB MEDICAL SUPPL" as of on or about July 16, 2023, until on or about January 29, 2024, at the **Subject Premises**. According to records recently received from Comcast, the **Subject Premises** still maintained an account with Comcast as of on or about November 22, 2024, however, the **Subject Premises** was assigned a different IP address since on or about January 30, 2024.

32

*BHIMANI's Use of Subject Premises IP Address to Access Medicare Billing Account for ADB MEDICAL*

71.     According to Medicare data, ADB MEDICAL submitted Medicare claims through a third-party billing clearinghouse, Office Ally. According to records received from Office Ally, Billing Company 1 electronically submitted claims on behalf of ADB MEDICAL through a sub-account maintained in the name of ADB MEDICAL. Based on my training and experience, I know that electronic claims submission interfaces like those offered by Office Ally typically may be accessed using a computer or, in some instances, a cellular phone or tablet device.

72.     According to records provided by Office Ally, the user records maintained for each account and sub-account associated with Billing Company 1 include a username, userID number, and name. According to these records, the Billing Company 1 sub-account for ADB MEDICAL contained, among others, username "AmiraliADB" with a listed name of "Amirali Bhimani."

73.     According to Office Ally records, Office Ally maintains a log of connection dates for IP addresses that access or otherwise interact with each account and sub-account held at Office Ally but does not maintain records of what specific account actions were associated with each IP address connection. Separately, Medicare maintains records related to claim submissions, including the date each claim is submitted to Medicare for reimbursement.

33

74. Law enforcement reviewed the IP address logs for the Office Ally Billing Company 1 sub-account in the name of ADB MEDICAL and compared that data to the claim submission date listed with Medicare claims data for ADB MEDICAL.

75. According to records received from Office Ally, an individual using the Subject Premises IP Address interacted with the Billing Company 1 sub-account for ADB MEDICAL on approximately 99 different dates between on or about September 8, 2022, and on or about January 25, 2024. According to Medicare claims data, Medicare received approximately 171 claims for reimbursement for DME from ADB MEDICAL on the 99 dates that a user interacted with the Billing Company 1 sub-account for ADB MEDICAL from the Subject Premises IP Address. ADB MEDICAL requested approximately $425,350.00 in reimbursement for DME from Medicare and ADB MEDICAL was paid approximately $97,630.13 as a result.

76. Law enforcement also obtained financial institution records from PNC Bank, which listed BHIMANI as the sole signor for personal bank account number xxxxx8937 (the "BHIMANI personal PNC Account"). According to these records, a user accessed the BHIMANI personal PNC Account from Subject Premises IP Address on approximately 74 occasions between on or about September 9, 2022, and on or about January 4, 2024. Financial institution records provided by PNC Bank for the BHIMANI personal PNC Account listed GPS latitude and longitude coordinates associated with some of the account activity. According to these records, between on or about October 6, 2022, and on or about January 4, 2024, location data was captured

34

by PNC Bank on 18 occasions when a user accessed the BHIMANI personal PNC Account from the Subject Premises IP Address. In all 18 instances, the GPS latitude and longitude coordinates indicated that the user interacting with the BHIMANI personal PNC account was located at or in the immediate vicinity of the **Subject Premises**.

*Use of Subject Premises IP Address to Access Chicago Care Medicare Billing Account*

77.     According to records received from Office Ally, CHICAGO CARE submitted claims for reimbursement for OTC kits through a sub-account controlled by Billing Company 1 named "chicagolab."

78.     According to records received from Office Ally, an individual using the Subject Premises IP Address interacted with the Billing Company 1 sub-account for CHICAGO CARE on approximately 42 different dates between on or about February 9, 2023, and on or about May 20, 2023. According to records provided by PNC Bank, a user accessed a PNC Bank account belonging to BHIMANI from the Subject Premises IP Address on approximately 74 occasions between on or about September 9, 2022, and on or about January 4, 2024. Between on or about October 6, 2022, and on or about January 4, 2024, location data was captured on 18 occasions when a user accessed the BHIMANI personal PNC Account from the Subject Premises IP Address. In all 18 instances where location data was captured, the GPS latitude and longitude coordinates indicated that the user interacted with the BHIMANI personal PNC account from at or in the immediate vicinity of the **Subject Premises**.

35

79. According to Medicare claims data, Medicare received approximately 214,419 claims for reimbursement from CHICAGO CARE on the 42 dates that a user interacted with the Billing Company 1 sub-account for CHICAGO CARE from the Subject Premises IP Address. CHICAGO CARE requested approximately $25,729,990.00 in reimbursement from Medicare and was paid approximately $19,468,660.40 related to those 214,419 claims.

*Use of Subject Premises IP Address to Access V Care Medicare Billing Account*

80. Records received from Office Ally indicate that V CARE claims for reimbursement were submitted to Medicare by a sub-account controlled by Billing Company 1 named "vcaretcor."

81. According to records received from Office Ally, an individual using the Subject Premises IP Address interacted with the Billing Company 1 sub-account for V CARE on approximately 13 different dates between on or about April 11, 2023, and on or about May 10, 2023. As described above in Par. 78, there is reason to believe that the Subject Premises IP Address was subscribed to the same geographic area as the **Subject Premises** during that time period.

82. According to Medicare claims data, Medicare received approximately 120,846 claims for reimbursement from V CARE on the 13 dates that a user interacted with the Billing Company 1 sub-account for V CARE from the Subject Premises IP Address. V CARE requested approximately $14,500,800.00 in reimbursement from Medicare and was paid approximately $9,511,770.24 related to those 120,846 claims.

36

*Use of Subject Premises IP Address to Access the Al-Ameer Medicare Billing Account*

83. Records received from Office Ally indicated that AL-AMEER claims for reimbursement of OTC kits were submitted to Medicare by a sub-account controlled by Billing Company 1 named "alameerlab."

84. According to records received from Office Ally, an individual using the Subject Premises IP Address interacted with the Billing Company 1 sub-account for AL-AMEER on approximately 14 different dates between on or about April 13, 2023, and on or about May 23, 2023. As described above in Par. 78, there is reason to believe that the Subject Premises IP Address was subscribed to the same geographic area as the **Subject Premises** during that time period.

85. According to Medicare claims data, Medicare received approximately 164,567 claims for reimbursement from AL-AMEER on the 14 dates that a user interacted with the Billing Company 1 sub-account for AL-AMEER from the Subject Premises IP Address. AL-AMEER requested approximately $19,748,040.00 in reimbursement from Medicare and was paid approximately $15,124,018.56 related to those 164,567 claims.

**5. BHIMANI Used Subject Phone 1 and Subject Phone 2 to Correspond with Individual M.S. and Others About Fraudulent Medicare Billing for OTC kits by CHICAGO CARE, V CARE, AL-AMEER, and Other Medical Providers**

86. Consistent with the above-referenced evidence that an individual was using the Subject Premises IP Address to access the billing accounts for CHICAGO CARE, V CARE, and AL-AMEER on dates when those entities were submitting

37

fraudulent claims to Medicare, during the execution of the search warrant for Individual M.S.'s phone, law enforcement recovered numerous messages on the encrypted messaging platform WhatsApp[12] between Individual M.S. and BHIMANI in which they discussed the accounts at Billing Company 1 utilized to submit claims to Medicare and the subsequent payments from Medicare which were caused by the claim submissions through Billing Company 1.

87.     On or about February 4, 2023, BHIMANI, using **Subject Phone 1**, sent a message to Individual M.S., in which BHIMANI stated, "Chicago lab clearing house confirmed. Got the credentials too." Based on my training and experience, in the Medicare context, a "clearing house" is an entity such as Office Ally that is used to submit health insurance claims to various insurance companies, including Medicare. According to records received from Office Ally, the Billing Company 1 sub-account for CHICAGO CARE was established on or about February 1, 2023.

88.     On or about February 6, 2023, BHIMANI, using **Subject Phone 1**, sent Individual M.S. a message containing a photograph of what purported to be an invoice from Edutech to "Chicago Lab" for "COVID self test kits."

---

[12] Based on my training and experience, I know that WhatsApp is a multiplatform messaging service that enables users to chat directly or in groups using text, voice, and video. These communications can be performed using a smartphone Internet connection, such as the one that would have been available through **Subject Phone 1** or Subject Phone 2. WhatsApp encrypts the communications made by its users.

89.     On or about February 13, 2023, BHIMANI, using **Subject Phone 1**, sent Individual M.S. a message containing a photograph that I believe, based on my training and experience, depicts Medicare claims data for CHICAGO CARE.

90.     On or about March 25, 2023, BHIMANI, using **Subject Phone 1**, sent Individual M.S. a message containing what appears to be a screenshot that included details on two checks from National Government Services, Inc.[13] The first check number listed was "898392622," dated March 27, 2023, and in the amount of $580,732.32. According to financial records for the CHICAGO CARE Medicare Account, a deposit of $580,732.32 from NGS was made on or about March 29, 2023, with a listed check number of "898392622," for the reimbursement of OTC kits claims submitted.

91.     On or about April 7, 2023, BHIMANI, using Subject Phone 2, exchanged a series of messages with Individual M.S., during which BHIMANI directed Individual M.S. to bring "cash" to the **Subject Premises**.

92.     On or about April 12, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a message containing a screenshot photograph, included below as *Image 4*, which included an image of a "Health Care Claim Payment/Advice" form. The name listed at the top of the form is "Syyed Ali (chicagolab)." As noted above, the username for the Billing Company 1 sub-account for CHICAGO CARE at Office Ally

---

[13] National Government Services, Inc. ("NGS") is the entity which administers payments from the Medicare program to providers such as CHICAGO CARE.

39

was "chicagolab." *Image 4* contains a partially visible check number, ending in 8443453, with a listed check amount of $152,785.92. According to financial institution records, the CHICAGO CARE Medicare Account received a deposit from NGS on or about April 14, 2023, in the amount of $152,785.92, with a listed reference number of 898443453. Records obtained from Medicare show that deposit was made to CHICAGO CARE for the reimbursement of OTC kits claims submitted. Also, according to Office Ally records, on or about April 12, 2023, IP address 69.243.185.89, which was subscribed to the **Subject Premises**, accessed the Billing Company 1 sub-account for CHICAGO CARE held at Office Ally.



40

*Image 4*

93.    On or about April 12, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a message containing a screenshot photograph, included below as *Image 5*, which included an image of an "Electronic Claim Submission Payer Responses Provided by Off[ice Ally]" form. The name listed at the top of the form was "Ali, Syyed (vcaretcor)." As noted above, the username for the Billing Company 1 sub-account for V CARE at Office Ally was "vcaretcor." *Image 5* appears to display the number of health insurance claims accepted and the total amount of reimbursement requested by V CARE, however, there is not an associated payment amount listed in *Image 5*. Also, according to Office Ally records on or about April 12, 2023, the Subject Premises IP Address accessed the Billing Company 1 sub-account for V CARE held at Office Ally. According to Medicare claims data, on or about April 12, 2023, V CARE submitted approximately 11,510 distinct claims to Medicare and requested reimbursement of approximately $1,381,200 for those claims.

41



*Image 5*

94.     On or about April 17, 2023, BHIMANI, using Subject Phone 2, sent Individual M.S. a message containing a screenshot of a form titled "Electronic Claim Submission Payer Responses Provided by Office Al[ly]." The form is addressed to "Ali, Syyed (alameerlab)," which is the username for the Billing Company 1 sub-account for AL-AMEER at Office Ally. The form displays the number of health insurance claims accepted and the total amount of reimbursement requested by AL-AMEER, however, there is not an associated payment amount listed. According to Office Ally records, on or about April 17, 2023, the Subject Premises IP Address accessed the Billing Company 1 sub-account for AL-AMEER held at Office Ally. According to Medicare claims data, on or about April 17, 2023, AL-AMEER submitted

42

approximately 35,305 distinct claims to Medicare and requested approximately $4,236,600 for those claims. The form depicted in the message sent by BHIMANI includes a smaller total for claim submissions and accepted dollars for those claims, however, the timestamp in this message indicates it was sent at or about 3:37 PM on April 17, 2023. The Medicare claims data available to law enforcement includes all claim submissions submitted within the 24 hours comprising April 17, 2023, with no way to differentiate what time during the day a claim was submitted. Therefore, if additional claims were submitted to Medicare after the screenshot was taken and sent, it would explain the higher number of claims recorded within the Medicare claims data.

### 6. BHIMANI Made False Statements Denying His Knowledge and Relationship with CHICAGO CARE, V CARE, and AL-AMEER

95. During the interview on or about December 4, 2024, BHIMANI stated that he was the owner of ADB MEDICAL. BHIMANI further initially stated that he was the only employee of ADB MEDICAL, but later in the interview admitted Individual D.A. was also another employee of the company, and that BHIMANI and Individual D.A. were the only two individuals who ever worked for ADB MEDICAL. BHIMANI further identified Billing Company 1 as the entity ADB MEDICAL used to become credentialed with Medicare, to acquire patients, and to submit claims to Medicare.

96. BHIMANI admitted that he had access to the ADB MEDICAL account held at Office Ally by Billing Company 1 but denied using the account to submit

43

health insurance claims on behalf of ADB MEDICAL, and further stated he did not have knowledge of how to utilize Billing Company 1 account software to bill on behalf of ADB MEDICAL. When provided the names of CHICAGO CARE, V CARE, and AL-AMEER, both BHIMANI and Individual D.A. denied any involvement with the companies or performing business on behalf of those entities. When BHIMANI was asked directly if he had heard of any of the three companies he responded "No, I don't."

97. At the conclusion of the interview, BHIMANI and Individual D.A. were individually served with Grand Jury subpoenas seeking records related to BHIMANI and/or ADB MEDICAL's involvement with CHICAGO CARE, V CARE, and AL-AMEER, among other medical providers. On or about December 18, 2024, BHIMANI, through his counsel, provided the government a response to this subpoena, indicating BHIMANI had no business relationship with these entities through the statement "ADB Medical Supplies Inc. never worked with these businesses but I heard about them from [Individual D.A.] who told me that [Billing Company 1], the billing company I used had some dealings with these companies."

98. Accordingly, there is probable cause to believe that on or about March 13, 2023, AMIRALI BHIMANI knowingly and willfully executed and attempted to execute a scheme to defraud Medicare, and to obtain by means of false and fraudulent pretenses, representations, and promises, any of the money owned by and under the custody and control of Medicare, in connection with the delivery of and payment for

44

health care benefits, items, and services, by submitting and causing to be submitted a claim for the provision of eight OTC kits to beneficiary L.R., when such services were not provided, in violation of Title 18, United States Code, Section 1347.

### E.    Use of Cellular Telephones Generally

99.    Based upon my training and experience, I know that cellular telephones may contain evidence relevant to the **Subject Offense**. For example, text messages and similar communications on messaging apps that are made or received from **Subject Phone 1** that are located in its memory may provide information regarding the identities of, and the methods and means of operation and communication used by, any participants in the offenses that are the subject of this investigation. Moreover, digital photographs located in the memory of **Subject Phone 1** may contain images of the tools or participants involved in the offenses that are the subject of this investigation. Also, digital photographs stored in **Subject Phone 1** may contain images of the user of **Subject Phone 1**, the user's associates (including persons involved in or knowledgeable about the **Subject Offense**), places frequented by the user of the phone leading up to and during the **Subject Offense**, and locations and instrumentalities used in committing the **Subject Offense**.

100.    In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion. In my training and experience, the

45

information stored within a cellular telephone can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cellular telephone at a relevant time. Further, such stored electronic data can show how and when the cellular telephone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular telephone account owner.

101. Additionally, information stored within a cellular telephone may indicate the geographic location of the cellular telephone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cellular telephone owner's state of mind as it relates to the offenses under investigation. For example, information in the cellular telephone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cellular telephone itself or by a

46

program that deletes or over-writes the data contained within the cellular telephone, such data will remain stored within the cellular telephone indefinitely. Based on my training and experience, I know that individuals often transfer data from one cellular telephone to another if they obtain a new cellular telephone.

102. Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones, and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, **Subject Phone 1** is associated with BHIMANI, and because, in my experience and in the experience of other agents, subjects use cellular telephones to contact other participants in their criminal conduct (such as those co-scheming with the owner of **Subject Phone 1**), there is probable cause to believe that **Subject Phone 1**, further described in Attachment A-2, contains evidence of violations of the **Subject Offense**.

103. Additionally, based on my training and experience, I know it is common for those engaged in criminal activity to obtain and use one or more "burner" cellular telephones that are not directly attributable to the criminal actor through subscriber records – that is, a cellular telephone subscribed in an alias name or in the name of a third party – to engage in and facilitate criminal conduct. Criminals also frequently use multiple cellular telephones as a means to compartmentalize communications; for example, using one cellular telephone to communicate with the government and

47

other entities involved in billing for, and receiving funds derived from, claims for health care services; but using another cellular telephone or messaging app to communicate with those co-scheming to fraudulently submit claims and obtain such funds. Finally, it is not uncommon for those participating in criminal activity to maintain a "clean" cellular telephone used principally to communicate with others – such as family members or friends – who are *not* engaged in criminal activity.

104.    Considering these facts, there is probable cause to believe that evidence relevant to this investigation will be recovered from **Subject Phone 1**. Further, because, as explained above, IP address records indicated that BHIMANI and/or others utilized electronic devices located at the **Subject Premises** in connection with the **Subject Offense**, and because IP address records do not identify which device was used in connection with the **Subject Offense**, there is probable cause to believe that any computer, tablet, or cellular telephone connected to BHIMANI and located on BHIMANI at the time of his arrest or located at the **Subject Premises** will contain evidence of violations of the **Subject Offense**.

## III.    SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

105.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software,

computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

49

106.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

107.    In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they were used to carry out criminal activity.

108.    The warrant I am applying for would permit law enforcement to obtain from BHIMANI the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

109.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

50

110. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

111. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

a. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when

51

the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

b. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

c. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than a certain number of hours have elapsed since the device was last unlocked or (2) when, within a certain number of hours, the device has not been unlocked using a fingerprint and the passcode or password has not been entered. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a

52

short time. Thus, it will likely be necessary for law enforcement to have the ability to require BHIMANI to unlock electronic devices using biometric features in the same manner as discussed above.

d.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of BHIMANI to the fingerprint scanner of the device;[14] and (2) hold the device in front of the face of BHIMANI and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## IV.     PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

112.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information (as described in Attachment A-1) and so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

---

[14] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

53

113. The review of electronically stored information and electronic storage media removed from the **Subject Premises**, described in Attachment A-1, may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a. examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in the applicable Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in the applicable Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) otherwise unlawfully possessed, or (5) evidence of the offense specified above);

c. surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in the applicable Attachment B; and

d. opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in the applicable Attachment B.

54

114. The government will return any electronic storage media removed from the **Subject Premises** within 60 days of their removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## V.   CONCLUSION

115. Based on the above information, I respectfully submit that there is probable cause to believe that the **Subject Offense** was committed by BHIMANI. Additionally, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachment B-1, will be found in the **Subject Premises**, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B-2, will be found in the **Subject Phone 1**. I therefore respectfully request that this Court issue a criminal complaint and arrest warrant for BHIMANI, and search warrants for the **Subject Premises** and **Subject Phone 1** described in Attachments A-1 and A-2, and authorizing the seizure of the items described in Attachments B-1 and B-2, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

Randell M. Harold
Special Agent, FBI

Sworn to and affirmed by telephone the 31st day of December, 2024

Honorable Young B. Kim
United States Magistrate Judge

56

## ATTACHMENT A-1

The business suite pictured below, located at 4255 Westbrook Drive, Suite 223, Aurora, Illinois (the "**Subject Premises**"):



## ATTACHMENT B-1

### LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, and fruits concerning violations of Title 18, United States Code, Sections 1347 (the "**Subject Offense**"), as follows:

1.     United States currency, financial instruments, and evidence of assets derived from or used in the **Subject Offense**;

2.     Records, including information stored on electronic devices, relating to ownership, dominion, or control of the **Subject Premises**, ADB MEDICAL, CHICAGO CARE, V CARE, AL-AMEER, Marketing Company 1, and Billing Company 1, and recovered electronic storage devices, including utility and telephone bills, mail envelopes, addressed correspondence, rental and lease agreements, receipts of purchase, and internet service and cellular telephone service records.

3.     Records, including information stored on electronic devices, relating to ADB MEDICAL, CHICAGO CARE, V CARE, AL-AMEER, Marketing Company 1, and Billing Company 1, and other healthcare service providers who are billing Medicare, or other health care benefit programs.

4.     Records, including information stored on electronic devices, related to the acquisition, purchase, or sale of Medicare beneficiary information.

5.     Records, including information stored on electronic devices, related to health care claims submission, status, and payment, and supporting medical records.

58

6.      Records, including information stored on electronic devices, of communication relating to the **Subject Offense**, such as communications with Medicare (or contractors working with Medicare), billing clearinghouses (such as Office Ally), the Illinois Secretary of State, other health care benefit programs, other health care benefit program billing services, and co-schemers, such as Individual M.S. and Individual D.A.

7.      Financial information, including information stored on electronic devices, pertaining to the **Subject Offense**, including ledgers, financial accounts, and expenses paid to facilitate the **Subject Offense**.

During the execution of the search of the premises described in Attachment A-1, law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of BHIMANI, to the fingerprint scanner of the device; or (2) hold a device found at the premises in front of the face of BHIMANI and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

59

**ATTACHMENT A-2**

The cellular telephone answering to (773) 501 – 0795.

## ATTACHMENT B-2

### LIST OF ITEMS TO BE SEIZED

Evidence and instrumentalities concerning the **Subject Offense**, a violation of Title 18, United States Code, Section 1347, as follows: call logs; contact lists; communications such as text messages, WhatsApp and other app-based messages, voicemails, instant messages, and emails; photographs and videos; financial records; internet search and use history, and user attribution information, for the period from February 1, 2022, to the present.

Law enforcement personnel are authorized to press or swipe the fingers (including thumbs) of BHIMANI to the fingerprint scanner of the **Subject Phone 1**[15] and/or hold the **Subject Phone 1** in front of the face of BHIMANI and activate the facial recognition feature, for the purpose of attempting to unlock the **Subject Phone 1** in order to search its contents as authorized by this warrant.

---

[15] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

**ADDENDUM TO ATTACHMENT B**

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information, including cellular telephones, that are described in Attachment B and found in the premises described in Attachment A-1 or A-2 so that they may be reviewed in a secure environment for information consistent with the warrant.

Subject to the exceptions to the warrant requirement as recognized by law, the government may search only those electronic storage media that fall within the criteria as described in Attachment B, which may either be all electronic storage media found in the premises or only a subset of the electronic storage media found in the premises.

The government's review of removed electronic storage media shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A-1 or A-2 may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

The government will return any electronic storage media removed from the premises described in Attachment A-1 within 60 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media constitutes an instrumentality of crime, or unless otherwise ordered by the Court.